Source: Legal > / . . . / > **OH Federal District Courts** ⓘ
Terms: **name(lindstrom)** (Edit Search)

✔Select for FOCUS™ or Delivery
☐

*2003 U.S. Dist. LEXIS 12545, \**

ROLF **LINDSTROM,** Plaintiff, vs. AC PRODUCTS LIABILITY TRUST, et al., Defendants.

CASE NO. 1:98 CV 13222

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

2003 U.S. Dist. LEXIS 12545

May 19, 2003, Filed

**PRIOR HISTORY:** Lindstrom v. AC Prods. Liab. Trust, 2003 U.S. Dist. LEXIS 12549 (N.D. Ohio, May 7, 2003)

**DISPOSITION: [\*1]** Motion for summary judgment filed by Goulds Pumps, Inc. and Henry Vogt Machine Company GRANTED. John Crane, Inc.'s motion for summary judgment DENIED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, a career merchant mariner, sued defendants, a packing and gaskets company, a pump company, and a valve company, in which he sought compensation for his asbestos-related illness. Defendants each moved for summary judgment.

**OVERVIEW:** The mariner alleged that he worked with numerous pieces of equipment which exposed him to asbestos and asbestos-containing products. Defendants were manufacturers of equipment which utilized asbestos as part of or with their products. The court found that at least four years of maintenance of the valves occurred before the mariner began working on any of the valve company's valves, and there was no evidence that the mariner was the first person to remove any original packing or gasket. It was unreasonable to assume that any valve he serviced had the original packing or gasket material. The mariner failed to identify the valve company or the pump company as the manufacturer, supplier or distributor of any replacement packing or gasket material. However, with regard to the packing and gasket company, the mariner supplied an expert report which stated that the asbestos contained in the packing materials from the packing and gasket company became friable after use and released asbestos fibers into the air and that the fibers would be available to be breathed by the person performing the removal and anyone working in close proximity to that individual.

**OUTCOME:** Summary judgment was granted in favor of the pump and valves companies, but summary judgment was denied for the packing and gaskets company.

**CORE TERMS:** packing, summary judgment, valve, asbestos-containing, manufacturer, asbestos, gasket, pump, vessel, deposition, replacement, exposure, supplier, manufactured, supplied, exposed, sailed, metal, sheet, deposition testimony, factual issue, contradicts, distributor, aboard, exposed to asbestos, substantial factor, product liability, nonmoving party, genuine issue, submitting

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔍



**EXHIBIT**

E

*HN1*⚡Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court is to determine whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🗐
Civil Procedure > Summary Judgment > Summary Judgment Standard 🗐
*HN2*⚡Summary judgment is appropriate if a party which bears the burden of proof at trial does not establish an essential element of its case. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. More Like This Headnote

Torts > Products Liability > Negligence 🗐
*HN3*⚡In a products liability/asbestos claim a plaintiff must (1) identify an asbestos-containing product for which a defendant is responsible, (2) prove that he has suffered damages, and (3) prove that the defendant's asbestos-containing product was a substantial factor in causing his damages. The United States Court of Appeals for the Sixth Circuit holds that in order to establish a circumstantial case a plaintiff must show a substantial exposure to a particular defendant's product for a substantial period of time. More Like This Headnote

Governments > Courts > Judicial Precedents 🗐
*HN4*⚡When the facts of an unpublished decision are similar to the case at hand and the reasoning sound and persuasive, citation to and reliance on the unpublished opinion is appropriate. More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits 🗐
*HN5*⚡A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony. More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits 🗐
*HN6*⚡If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. More Like This Headnote

Torts > Products Liability > Strict Liability 🗐
*HN7*⚡With regard to product liability, a manufacturer is responsible only for its own products and not for products that may be attached or connected to the manufacturer's product. More Like This Headnote

Torts > Products Liability > Strict Liability 🗐
*HN8*⚡With regard to product liability, a defendant does not become liable based on a bare demonstration of "minimal exposure," even when the plaintiff's injuries arise from the relevant toxic substance. More Like This Headnote

**COUNSEL:** For Rolf Lindstrom, Plaintiff: Donald A. Krispin, LEAD ATTORNEY, Jaques Admiralty, Robert E. Swickle, LEAD ATTORNEY, The Maritime Asbestosis Legal Clinic, Detroit, MI.

For Acorn Iron & Supply Co., Defendant: Laura K. Hong, Squire, Sanders & Dempsey, Cleveland, OH.

**JUDGES:** United States District Judge Dan Aaron Polster.

**OPINIONBY:** Dan Aaron Polster

**OPINION: MEMORANDUM OF OPINION AND ORDER**

Before the Court are Defendants' Motion for Summary Judgment filed by John Crane, Inc.(**ECF No. 173**), Goulds Pumps, Inc.(**ECF No. 176**), and Henry Vogt Machine Company (**ECF No. 181**). Lindstrom filed a Response in Opposition and Defendants Goulds Pumps and Henry Vogt Machine Company filed Reply Briefs.

For the reasons that follow, Defendants Goulds Pumps and Henry Vogt Machine Co.'s motions for **[\*2]** summary judgment are GRANTED and Defendant John Crane, Inc.'s motion for summary judgment is DENIED.

## I. BACKGROUND FACTS

Plaintiff Rolf Lindstrom ("Lindstrom"), a career merchant mariner, filed this lawsuit against various defendants seeking compensation for his asbestos-related illness. Lindstrom sailed as a merchant seaman from July, 1964 until December, 1994 aboard numerous vessels. He worked primarily in the engine department in various crew positions, including Fireman/Watertender, Chief, and First, Second and Third Engineer. During his years as a seaman, Lindstrom alleges that he worked with numerous pieces of equipment which exposed him to asbestos and asbestos-containing products. On October 28, 1999, Lindstrom was diagnosed with mesothelioma, a form of cancer, which he claims was caused by asbestos exposure.

As Defendants, Lindstrom has named manufacturers of equipment who utilized asbestos as part of or within their products and manufacturers, distributors, or suppliers of asbestos and asbestos-containing products. n1 These include, John Crane, Inc.(packing and gaskets), Goulds Pumps, Inc. (pumps), and Henry Vogt Machine Co. (valves)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Over the course of litigation several defendants were voluntarily dismissed, dismissed pursuant to settlement or granted summary judgment. Lindstrom has also sued various shipowners and has reached a settlement with these companies.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*3]**

Lindstrom's suit includes claims for negligence under the Jones Act, 46 U.S.C. § 688 *et seq.,* the General Admiralty and Maritime law, and traditional product liability law.

## II. SUMMARY JUDGMENT STANDARD

*HN1* Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court is to determine "whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The court views

the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

*HN2* Summary judgment is appropriate if a party which bears the **[*4]** burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-248. In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249. Having discussed the Rule 56 standard of review, the Court now turns to the merits of each of the Defendants' motions for summary judgment.

## III. ANALYSIS

*HN3* In a products liability/asbestos claim a plaintiff must 1) identify an asbestos-containing product for which a defendant is responsible, 2) prove that he has suffered damages, and 3) prove that defendant's asbestos-containing product was a substantial factor in causing his damages. *Roberts v. Owens-Corning Fiberglas Corp.*, 726 F. Supp. 172, 174 (W.D.Mich. 1989); **[*5]** *Stark v. Foster Wheeler Company, Inc.*, Nos. 94 CV 11464, 98 CV 20002, (N.D. Ohio Feb. 18, 1999) (Polster, J.) aff'd, *Stark v. Armstrong World Industries*, 21 Fed. Appx. 371, 376 (6th Cir. Oct. 3, 2001) (unpublished). The Sixth Circuit recently held that in order to establish a circumstantial case a plaintiff must show a substantial exposure to a particular defendant's product for a substantial period of time. *Stark*, 21 Fed. Appx. at 380-81. Plaintiff argues that the Court should not rely on the unpublished *Stark v. Armstrong World Industries* decision, and cites *Miller v. American President Lines, Ltd.*, 989 F.2d 1450 (6th Cir. 1993) as controlling in the Sixth Circuit. The *Miller* decision, however, addressed liability claims and the standard for causation in a case against shipowners. The *Stark* decision analyzed the causation standard under maritime law for product liability claims asserted against manufacturers. *HN4* When the facts of an unpublished decision are similar to the case at hand and the reasoning sound and persuasive, citation to and reliance on the unpublished opinion is appropriate. *Bobcat Tatone Ford, Inc. v. Ford Motor Co.*, 197 F.3d 787, 790 (6th Cir. 1999); **[*6]** *Oviedo v. Jago*, 809 F.2d 326, 329 n.3 (6th Cir. 1987).

### Henry Vogt Machine Company n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 In his Response Brief, Lindstrom states that Vogt filed a Motion for Summary Judgment without leave of Court. The Court's docket reflects that Vogt filed for leave to file its Motion for Summary Judgment Instanter (ECF No. 171) and the Court granted this Motion on May 8, 2003.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In its motion for summary judgment, Henry Vogt Machine Co. ("Vogt") asserts that Lindstrom has not set forth any evidence to support his claim that any Vogt product proximately caused Lindstrom's mesothelioma.

In his deposition, Lindstrom identified Vogt as a manufacturer of valves on board vessels upon which he served. *Rolf L. Lindstrom Deposition Transcript* ("Lindstrom Depo."), at 46. Lindstrom did not testify that the Vogt valves themselves were composed of asbestos, but rather, that he believed that most of the valves contained asbestos packing which would have to be replaced from time to time. *Id.* Throughout **[*7]** his deposition, Lindstrom never named Vogt as the manufacturer of packing or gasket material that he worked with or was exposed to. *Id.* at 46-47. During discovery, Lindstrom was questioned at length regarding his memory of suppliers and manufacturers of allegedly asbestos-containing products. *Id.* at 127-128. He affirmed in his deposition that he had made a

good-faith effort to identify all of the suppliers of asbestos-containing products to which he may have been exposed. *Id.* n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Lindstrom filed an Affidavit with his Response Brief. *ECF No. 182,* Exh. A. This is inappropriate. HN5 "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck and Co., 790 F.2d 453, 460 (6th Cir. 1986)* (quoting *Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984)*). In his Affidavit, Lindstrom now alleges that "All of these [Vogt] valves were packed with asbestos-containing packing ... I specifically recall replacing the asbestos-containing packing materials and gaskets in working on Henry Vogt Machine Co.'s valves ... many times throughout my career." *Lindstrom Aff.* PP 6, 17. HN6 "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reid., 790 F.2d at 460* (quoting *Biechele, 747 F.2d at 215*).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*8]**

Vogt has acknowledged the production of valves which contained asbestos packing and gaskets in a verified response to Interrogatory No. 4 which reads in part:

> Vogt's Valve and Fitting Division produced high pressure, high temperature, and high performance valves (gate, globe and check valves) containing encapsulated asbestos packing and metal sheathed gaskets containing latex-filled asbestos manufactured by other suppliers. Such valves were produced, to the best of Vogt's knowledge, starting in the late 1930s and continuing until on or about September 1, 1986. The gaskets were metal wound with latex-filled white chrysotile asbestos encapsulated between each of the metal windings.

*ECF No. 171.* Any asbestos-containing packing or gasket material was sealed inside the metal valve when it was sold and installed. *Id.* In order to prove substantial exposure Lindstrom would have had to remove the original packing or gasket material.

A co-worker, George testified that Lindstrom was exposed to valves during the repair and replacement of the packing or gaskets. *Horace George Deposition Transcript* ("George Depo."), at 34-35. George testified that the replacement packing **[*9]** and gasket material was generally not supplied by the valve manufacturer but by the shipping company. George Depo. at 92, 144. When asked who manufactured or supplied the packing material George named five manufacturers, but did not mention Vogt as a manufacturer. *Id.* at 26-27. Furthermore, George testified that both asbestos and non-asbestos packing were used and that he could not tell the difference between valve packing which contained asbestos as opposed to packing that did not contain asbestos. *Id.* at 233-234; 244. n4 The *Almeria Lykes* was commissioned in 1972 n5 and Lindstrom boarded the vessel in 1975 or 1976. *Id.* at 50; *Lindstrom Depo.* at 31. According to George, maintenance on the valve packing and gaskets "didn't require constant attention" but the valves had to be maintained a couple times a year. *George Depo.* at 88. At least four years of maintenance of the valves occurred before Lindstrom began working on any Vogt valve, and there is no evidence that Lindstrom was the first person to remove any original packing or gasket. It is unreasonable to assume that any Vogt valve he serviced had the original packing or gasket material and he has failed to **[*10]** identify Vogt as the manufacturer, supplier or distributor of any replacement packing or gasket material. HN7 "A manufacturer is responsible only for its own products and "not for products that may be attached or connected" to the manufacturer's product. *Stark,* Nos. 94 CV 11464, 98 CV 20002, at 9. Therefore summary judgment is GRANTED to Henry Vogt Machine Company.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 Lindstrom filed Horace George's Second Affidavit with his Response Brief. *ECF No. 182,* Exh. B. As previously discussed in footnote 4, "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid,* 790 F.2d at 460. In his Second Affidavit, George now states that "All of these valves were packed with asbestos-containing packing." *George Second Aff.* P 7.

n5 Lindstrom testified that he sailed on two vessels by the name of *Almeria Lykes.* Lindstrom sailed on the *Almeria Lykes* between the mid-1970's until 1986. He joined a second, separate ship named *Almeria Lykes* in 1991, which is not the about vessel which George testified. *Lindstrom Depo.* at 166.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*11]

## Goulds Pumps, Inc.

To hold Goulds Pumps, Inc. ("Goulds") liable, Lindstrom bears the burden of proving that Goulds is responsible for an asbestos-containing product and that he had substantial exposure to the asbestos-containing product for a substantial length of time. *Roberts,* 726 F. Supp. at 174; *Stark,* 21 Fed. Appx. at 376.

Lindstrom identified Coffin, Aurora, Worthington and Goulds pumps being on board the vessels he sailed. *Lindstrom Depo.* at 39-40. Lindstrom testified that when he changed the packing on these pumps he was exposed to asbestos. *Id.* at 40. According to George, Lindstrom worked with repacking material on Goulds and other manufacturers' pumps no more than 10% of the time he was onboard the *Almeria Lykes. George Depo.* at 235. When Lindstrom was asked which brand [manufacturer of pumps] was more prevalent, he testified, "It depends on which ship you went on. Some of them used Aurora pumps, some of them used Worthington pumps. It all depends." *Lindstrom Depo.* at 41. Notably, he did not even mention Goulds pumps. *HN8* A "defendant does not become liable based on a bare demonstration of 'minimal exposure,' even [*12] when the plaintiff's injuries arise from the relevant toxic substance." *Roberts,* 726 F. Supp. at 174; *Stark,* 21 Fed. Appx. at 376.

When Lindstrom was asked to list all the companies that supplied asbestos-containing packing material to the *Almeria Lykes,* Lindstrom's list did not include Goulds. *Id.* at 42, 44-45; 146. George further testified that the majority of the replacement packing Lindstrom would have used was supplied by the shipping company. *George Depo.* at 144.

Lindstrom's co-workers, Horace George and William Kammerzell, did not identify in their depositions any Goulds product that was used by or in the vicinity of Lindstrom. n6 Lindstrom provided the Court with an affidavit from George which was made two years after George's deposition. In his affidavit, George stated that "most pumps aboard the vessel *Almeria Lykes,* including those manufactured by Gould Pumps, to operate for the purpose they were intended, needed a thermal packing material, all of which contained asbestos, to be installed and removed periodically." *ECF No. 176,* Exh. C, Affidavit of Horace George ("George Aff."), P 5. As previous stated, Lindstrom boarded [*13] the *Almeria Lykes* four years after it was commissioned. Assuming a periodic installation and replacement of packing material, it is unreasonable to assume that the packing he serviced was the original thermal packing material. Neither Lindstrom nor George identify Goulds as the manufacturer, supplier, or distributor of any original or replacement asbestos-containing packing material that was used on Goulds pumps. Accordingly, Goulds Pumps, Inc.'s motion for summary judgment is GRANTED.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Lindstrom attempts to use George's Second Affidavit to establish that George now recalls that pumps aboard the *Almeria Lykes* were manufactured by Goulds and that he recalls seeing Lindstrom replace asbestos-containing gaskets and packing materials in Goulds' pumps. *George Second Aff.* PP 21-22. As previously discussed in footnote 4, "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid, 790 F.2d at 460.*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

 [*14]

**John Crane, Inc.** n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 In his Response Brief, Lindstrom states "Counsel for John Crane then filed a motion for summary judgment out of time." *ECF No. 173* at 4. The Court's docket reflects that John Crane filed for leave to file its Motion for Summary Judgment (ECF No. 172) and the Court granted this Motion on May 9, 2003.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

John Crane, Inc. ("Crane") has moved for summary judgment on the ground that Lindstrom lacks evidence to support that any Crane packing and gaskets was a substantial factor in causing his injuries and damages.

Lindstrom identified Crane as a manufacturer of asbestos-containing packing, sheet packing material, and valve stem packing. *Lindstrom Depo.* at 42, 44 and 146-147. Lindstrom testified to his exposure to Crane's asbestos-containing products over a 30-year period of time. *Id.* at 42-47, 50, 146-148. He specifically stated that when he replaced the packing he had to "cut it for the length and pack it in there and cover it ... and it makes dust." *Id.* at 43. When **[*15]** questioned about how often he worked with packing Lindstrom testified "It's a big portion ... about half of the time." *Id.* at 146-147. Lindstrom also testified that "pretty much all" of the vessels contained John Crane packing. *Id.* at 147. Lindstrom specifically identified one form of John Crane packing as "6-AM packing." *Id.* George collaborates Lindstrom's testimony. George identified John Crane as a manufacturer that provided the *Almeria Lykes* with sheet packing and gasketing materials. *George Depo.* at 27, 39. George recalled Lindstrom using power and hand tools, power brush, and scraper to remove the packing. *George Depo.* at 30; 130. When Lindstrom would cut the sheet packing Lindstrom would be exposed to asbestos dust. *Id.* at 28.

Furthermore, Lindstrom supports his exposure by submitting an affidavit from Dr. James R. Millette. *ECF No. 183,* Exh. C, Affidavit of James R. Millette, ("Millette Aff."). Dr. James R. Millette stated that he tested sheet packing (gaskets), the 6-AM packing and other forms of valve and pump packing material manufactured by John Crane and found that these products are comprised of up to 85% of asbestos. *Millette Aff.* **[*16]** PP 4-5. He stated that the asbestos become friable after use and release asbestos fibers into the air and that "the fibers would be available to be breathed by the person performing the removal and anyone working in close proximity to that individual." *Id.* at P 6. Lindstrom has established enough to survive summary judgment, therefore, John Crane, Inc.'s motion for summary judgment is DENIED.

In accordance with the foregoing opinion, the motion for summary judgment filed by Goulds Pumps, Inc. and Henry Vogt Machine Company are **GRANTED (ECF Nos. 176 and 181).** Accordingly, the

claims brought by Plaintiff Rolf L. Lindstrom against the aforementioned Defendants are hereby dismissed with prejudice. All cross-claims or third party claims brought against any of these Defendants are also dismissed with prejudice.

John Crane, Inc.'s motion for summary judgment is **DENIED (ECF No. 173).** As previously ordered, there is a settlement conference on Thursday, May 22, 2003 at 10:00 A.M. If the case is not resolved, trial will commence on Wednesday, June 18, 2003 at 9:00 A.M.. The final pretrial is schedule for Tuesday, June 10, 2003 at 10:00 A.M.

**IT IS SO ORDERED.**

**United States  [\*17]  District Judge**

**Dan Aaron Polster**


Source: Legal > / . . . / > **OH Federal District Courts** ⓘ
Terms: **name(lindstrom)**  (Edit Search)
View: Full
Date/Time: Tuesday, October 26, 2004 - 3:54 PM EDT

\* Signal Legend:
● -  Warning: Negative treatment is indicated
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
ⓘ -  Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions


Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: Legal > / . . . / > NH Federal District Courts [i]
Terms: name(anderson) (Edit Search)

✔Select for FOCUS™ or Delivery
Γ

2004 DNH 73; 2004 U.S. Dist. LEXIS 7119, *

Peter Ulmann v. Carole A. **Anderson,** Superintendent, Merrimack County House of Corrections, et al.

Civil No. 02-405-JD

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

2004 DNH 73; 2004 U.S. Dist. LEXIS 7119

April 26, 2004, Decided

**NOTICE:** **[*1]** NOT FOR PUBLICATION

**PRIOR HISTORY:** Ulmann v. Anderson, 2003 U.S. Dist. LEXIS 874 (D.N.H., 2003)

**DISPOSITION:** Defendants' motion for summary judgment granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** While incarcerated at a county house of corrections awaiting trial, plaintiff pretrial detainee filed a pro se complaint against defendant superintendent of the facility and its chief of security claiming violations of the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act (RLUPIA). Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56.

**OVERVIEW:** Within the first few months after being booked into the facility, the detainee underwent a physical examination and medical history survey, received an electrocardiogram test (EKG), a chest x-ray, and a stress test. The court held that he had not provided any support for his theory that defendants manifested a deliberate indifference to his medical needs by failing to prevent or respond to his alleged heart attack since the repeated medical examinations failed to demonstrate such a condition. The defendants did not violate his rights by limiting him to collect calls. As a foreign national, he could not seek monetary relief for a violation of his rights under the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 595 U.N.T.S. 261. His religious rights claims were dismissed since he provided no proof that he had requested a kosher diet or a teffilin until 12 days before his discharge and defendants carried their burden to show that their policy of disallowing candles and glass but nevertheless arranging for a rabbi to oversee the lighting of an electric menorah at the jail, represented the least restrictive means of maintaining safety and security.

**OUTCOME:** Defendants were entitled to summary judgment on all claims. Defendants' motion to submit their summary judgment exhibits by entry of a computer disk was allowed. Defendants' motion to dismiss, motion for entry of late authority in support, and motion to extend their deadline for filing pretrial materials were denied as moot. The detainee's motions to compel and to extend deadlines were also denied as moot.

**CORE TERMS:** summary judgment, rabbi, candle, religious, prison, inmate, kosher, diet, care, heart attack, menorah, glass, prisoner, lighting, constitutional rights, qualified immu[...], entitled to summary judgment, religion, staff, food, least restrictive, consular, detainee, te[...]

**EXHIBIT**

F

chest, pain, compelling governmental interest, pretrial, enforceable, treaty

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard
*HN1* ⚡ A court may grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
*HN2* ⚡ The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. The court must view the entire record in the light most favorable to the plaintiff, indulging all reasonable inferences in that party's favor.  More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Prisoners > Confinement Conditions
Constitutional Law > Civil Rights Enforcement > Prisoners > Freedom of Religion
Constitutional Law > Civil Rights Enforcement > Prisoners > Safety
*HN3* ⚡ Pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that are enjoyed by convicted prisoners. Nevertheless, the fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. To define these limits, the court must evaluate the challenged practice in the light of the central objective of prison administration, safeguarding institutional security. This evaluation is a deferential one, giving due regard to the professional expertise of corrections officials and the limited role of the judiciary in operating and overseeing correctional facilities.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
*HN4* ⚡ A summary judgment motion requires the opposing party to have appropriate notice and a chance to present its evidence on the essential elements of the claim or defense.  More Like This Headnote

Constitutional Law > Cruel & Unusual Punishment
Constitutional Law > Substantive Due Process > Scope of Protection
Constitutional Law > Civil Rights Enforcement > Prisoners > Medical Treatment
*HN5* ⚡ The United States Supreme Court has held that the rights of a pretrial detainee to adequate medical care under the Due Process Clause are at least as great as the Eighth Amendment protections available to a convicted prisoner. Accordingly, jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees that is tantamount to an intent to punish.  More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Prisoners > Medical Treatment
*HN6* ⚡ In order to be found "deliberately indifferent," prison officials must be shown to have been subjectively aware of a medical condition of a prisoner requiring their intervention.  More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Prisoners > Confinement Conditions
*HN7* ⚡ A pretrial detainee's use of the telephone may be subjected to limitations which reasonably reflect legitimate apprehensions about the security and order of the institution where he or she is detained.  More Like This Headnote

Constitutional Law > Civil Rights Enforcement > Prisoners > Access to Courts
Constitutional Law > Civil Rights Enforcement > Prisoners > Confinement Conditions

prisoners to possess glass because of its potential use as an instrument of violence or suicide have also been upheld. These cases largely had analyzed prison policies forbidding the items under the standard set forth in Turner v. Safley. There, the Supreme Court has held that when a prison regulation impinges on an inmate's constitutional rights, it is valid if it is reasonably related to legitimate penological interests. Under the Religious Land Use and Institutionalized Persons Act (RLUPIA), however, any substantial burden imposed on an inmate's religious exercise cannot stand unless that burden represents the least restrictive means of furthering a compelling governmental interest. 42 U.S.C.S. § 2000cc-1(a). Thus, cases decided pursuant to the standard in place prior to the RLUIPA provide limited guidance in determining the validity of keeping religious articles from inmates under the new statutory regime. More Like This Headnote

Constitutional Law > Fundamental Freedoms > Freedom of Religion > Free Exercise of Religion 📖
Constitutional Law > Civil Rights Enforcement > Prisoners > Freedom of Religion 📖
HN17⚓The Free Exercise Clause provides less protection to a pretrial detainee's religious practices than the Religious Land Use and Institutionalized Persons Act (RLUPIA) does. More Like This Headnote

**COUNSEL:** For Merrimack County Jail, Superintendent, Defendant: John A. Curran, Getman Stacey Schulthess & Steere PA, Bedford, NH.

For United States Attorney General, Intervenor: Jeffrey D. Kahn, US Dept. of Justice, Washington, DC.

**JUDGES:** Joseph A. DiClerico, Jr., United States District Judge.

**OPINIONBY:** Joseph A. DiClerico, Jr.

**OPINION:** ORDER

While incarcerated at the Merrimack County House of Corrections (the "MCHC") awaiting trial, Peter Ulmann filed a pro se complaint against Carole Anderson, the superintendent of the facility, and Jeffrey Croft, its chief of security. n1 The defendants have moved for summary judgment on Ulmann's claims on a number of grounds. Ulmann objects.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Ulmann's complaint identified Croft as "Captain Craft" and named Henry Simons, a physician's assistant who treated Ulmann at the MCHC, as an additional defendant. Simons was dismissed from the case as recommended by the magistrate. See infra.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*2]**

Background

The following relevant undisputed facts appear in Anderson's affidavit and the documents submitted with the parties' summary judgment motions. n2 Ulmann was first booked into the MCHC on December 14, 2001, after being arrested on charges arising out of his alleged theft of diamonds from a jewelry store in Concord, New Hampshire, and a charge of being a fugitive from justice in Nevada. A report of Ulmann's medical condition prepared the next day indicates that he had previously been prescribed a number of medications to treat his Type II diabetes and hypotension. On December 19, 2001, Ulmann underwent a physical examination and medical history survey where he mentioned that he had only one kidney. He also related that he had been treated and

released for complaints of chest pain at Concord Hospital on the day he was arrested. In response to similar complaints by Ulmann throughout January, 2002, Simons recommended on January 31, 2002, that Ulmann receive a stress test. n3 The results of the test, performed on February 5, 2002, by a cardiologist outside the prison, were "unremarkable."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Neither party's summary judgment brief complies with L.R. 7.2(b)'s mandate that it "incorporate a short and concise statement of material facts." Instead, both Ulmann's and the defendants' briefs go directly to arguing their positions, referring to certain facts as they pertain to each section of argument, rather than following the more customary (and helpful) format of prefacing argument with an organized statement of all the underlying facts of the case. Anderson's affidavit is not an effective substitute for a Rule 7.2(b) statement, as it consists of fifty-eight numbered paragraphs taking up twenty-five single-spaced pages replete with parenthetical phrases and sentences of Joycean length, as well as two whole pages which pertain to a different inmate altogether. Nevertheless, because the facts on which each brief relies are supported by record citations, if only minimally, the court has taken upon itself the task of organizing the largely undisputed facts into one coherent statement. Furthermore, the defendants' motion to submit its exhibits on a CD-ROM (document no. 46) is allowed without objection. The court notes, however, that submitting only relevant documents, rather than every single scrap of paper produced to Ulmann in discovery, would have been more helpful. **[*3]**

n3 Ulmann was seen by prison medical staff for reports of chest pain or dizziness on ten occasions between January 4, 2002, and February 4, 2002. He was prescribed a number of medications during that period.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Ulmann claims in his amended complaint that he "suffered what he believed to be a heart attack" in February 2002, three days before receiving an electrocardiogram test ("EKG") and chest x-ray. His medical records, however, show that Ulmann actually underwent the EKG and x-ray on January 24, 2002, the same day on which prison medical staff saw him twice for complaints of pain and numbness in his left side and arm and difficulty breathing. The results of the x-ray and the EKG were negative. Ulmann neither sought nor received medical attention three days before receiving the EKG and x-ray and, at that point, had not requested medical care since January 3, 2002. n4

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Although Ulmann was not seen until the next day, January 4, 2002, the defendants explain that the delay resulted from their initial unawareness of Ulmann's request, which he made through a note left among shaving materials returned to a guard.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*4]**

Shortly after arriving at the MCHC, Ulmann received permission to make a five-minute call to his family in Singapore on a weekly basis from a staff telephone. Although this privilege was briefly suspended in late March 2002, due to a clarification of jail policy, Anderson nevertheless allowed Ulmann to make nine overseas calls between April 16, 2002, and July 7, 2002. She later discovered, however, that Ulmann had not charged a number of calls he made during that period to his calling card, but had dialed them direct, causing the MCHC to incur $ 273.68 in long distance charges. In a July 23, 2002, letter to Anderson, Ulmann admitted to making some of these calls, explaining that his "prepaid calling card did not function and the c.o. assisting dialed the number direct." n5 He also

asked to charge another call to his wife to the MCHC so he could obtain a number where he could call her collect. Anderson responded that Ulmann would be allowed to make calling-card calls to Singapore again after receiving funds from his family to pay the long distance charges, which he had promised to do in his July 23, 2002, letter. Ulmann never did so, however.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 This document belies Ulmann's unsupported statement in his objection that the corrections officers "stated that they did not want to go [sic] Plaintiff's property to get the card and they would direct dial and let the county pay for it."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*5]**

Ulmann, who asserts that he is an Israeli citizen, n6 was permitted to visit at the MCHC with two members of the Israeli consulate on August 18, 2002. He claims in his objection to summary judgment that this visit "was obstructed" because it occurred "in a Visiting Room with everyone else and there was no privacy." Anderson later advised the MCHC staff in writing that consulate members would be meeting with Ulmann on November 6, 2002, and that "they can visit in the law library and they may close the door if they want to." The delegation, however, failed to appear for either this visit or another one which had been scheduled, with the same privileges, for December 1, 2002.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Ulmann's MCHC intake survey lists his nationality as American, while his book-in summary lists it as "other." For purposes of this motion, the court will assume that Ulmann is an Israeli citizen.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Ulmann, an observant Jew, wrote to David Hassett, the MCHC program director, on November 5, 2002, asking him to contact a local rabbi to provide **[*6]** Ulmann and his fellow Jewish inmates with "the candelbraw [sic] and the candles and the other condiments" required to celebrate the upcoming Chanukah holiday. Hassett responded in writing that candles were not allowed inside the facility but that he had nevertheless contacted the rabbi "to possibly provide other condiments" for the holiday, to be celebrated from November 29, 2002, through December 7, 2002. In a November 21, 2002, letter to Hassett, who had explained to Ulmann that candles were prohibited for safety reasons, Ulmann wrote, "I cannot see that lighting candles in the kitchen for 20 minutes for eight nights, under a Correctional Officer [sic] supervision is construed to be a 'security or safety problem.'"

Hassett spoke to the rabbi on December 2, 2002, telling him that inmates were permitted neither candles nor lightbulbs but suggesting that he "come in to oversee [a] glass candle lighting" for Ulmann. Hassett directed that a room be set aside for this purpose after the rabbi indicated that he would visit Ulmann the next day, but the rabbi ultimately canceled his visit. On December 5, 2002, however, he delivered an electric menorah to the MCHC on Ulmann's **[*7]** behalf. Hassett withheld the object from Ulmann, explaining in a memorandum to him the next day that the glass lightbulbs presented a safety and security issue and that the menorah would be placed with Ulmann's secured property.

In a December 6, 2002, letter to Anderson, which she received three days later, Ulmann charged that he had not been "allowed to celebrate the Chanukah . . . under the Rabbi [sic] supervision." He also wrote that during his incarceration at the MCHC for nearly all of the preceding year, he "was not given even once 'kosher food' as a practicing orthodox jew should be allowed, nor was I allowed to put on the 'Teffilin' . . . that as orthodox jews we pray with six times a week." Anderson states in her affidavit that Ulmann had never raised these issues previously. Ulmann responds in his objection

that he made "written requests/grievances, etc." with respect to requiring a kosher diet but that these documents have been lost by the defendants. In a letter of March 12, 2002, submitted by the defendants, Ulmann requested a vegetarian diet both for health reasons and because "eating ham and pork is offensive to me and my religion" but did not reference a kosher **[*8]** diet.

Ulmann's objection also refers to a series of letters to him from a rabbi in Brooklyn, New York. One of those, dated May 23, 2002, encourages Ulmann "not [to] give up on kosher food. It is the right of every Jewish prisoner . . . ." Another, dated September 12, 2002, recounts that its writer spoke to the Manchester rabbi, "asking him about Tefillin, and he told me that this is not allowed," presumably in the MCHC.

On December 18, 2002, Ulmann was discharged from the MCHC to begin serving a sentence at the New Hampshire State Prison. He commenced this action on September 4, 2003, seeking damages and equitable relief in the form of a transfer. Following initial screening of the complaint pursuant to 28 U.S.C. § 1915A, the magistrate recommended that Ulmann be allowed to proceed on his claims that the defendants had violated his rights to (1) free exercise of religion, (2) adequate food, (3) consular visitation under the Vienna Convention on Consular Relations, (4) familial relations, and (5) adequate medical care. n7 *Ulmann v. Anderson,* 2003 U.S. Dist. LEXIS 874, 2003 DNH 12, 2003 WL 168653 (D.N.H. Jan. 21, 2003). The court adopted the recommendation over Ulmann's objection.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 The magistrate initially dismissed Ulmann's claim arising out of the alleged denial of adequate medical care without prejudice to his ability to renew it by alleging "additional facts indicating that he has been injured by the MCHC's inadequate medical care." Ulmann responded by moving to amend his complaint to allege such facts, which was allowed.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*9]**

Standard of Review

*HN1* The court may grant a motion for summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *HN2* The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The court must view the entire record in the light most favorable to the plaintiff, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

Discussion

*HN3* "Pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that . . . are enjoyed by convicted prisoners." Bell v. Wolfish, 441 U.S. 520, 545, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); see also Riggins v. Nevada, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992); **[*10]** Roberts v. Rhode Island, 239 F.3d 107, 109 (1st Cir. 2001). Nevertheless, "the fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights." Bell, 441 U.S. at 546. To define these limits, the court must evaluate the challenged practice in the light of the central objective of prison administration, safeguarding institutional security. Id. "This evaluation is a deferential one, giving due regard to the professional expertise of corrections officials and the limited role of the judiciary in operating and overseeing correctional facilities." Roberts, 239 F.3d at 110 (internal quotation marks and citations to Bell omitted).

Ulmann's complaint charges that the defendants violated a number of his constitutional rights during his incarceration at the MCHC. The defendants seek summary judgment against these claims on a two-tiered theory. Because their motion is subtitled "Qualified Immunity," however, Ulmann explains that he has "argued his objection on that theory only," and purportedly "reserves his right to expand [his] objection based upon the court's [*11] determination" that the defendants have sought summary judgment on additional grounds.

Notwithstanding the title of the defendants' motion, the body of the document expressly states that they are moving for summary judgment "based on the principles of qualified immunity and the plaintiff's inability to further prosecute this action, based on bare allegations" (emphasis added). Indeed, Ulmann himself quotes this passage on the first page of his objection, and both he and the defendants devote the vast majority of their briefing to the argument that Ulmann lacks evidence to support his claims, rather than to the qualified immunity defense. n8 The defendants' moving papers were therefore sufficient to (and in fact did) put Ulmann on notice that they were seeking summary judgment not only on qualified immunity grounds, but also because Ulmann could not come forward with any affirmative evidence of his claims. See Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29-30 (1st Cir. 1996) (deciding HN4 summary judgment motion requires opposing party to have "appropriate notice and a chance to present its evidence on the essential elements of the claim or defense"); cf. Fed. Refinance Co. v. Klock, 352 F.3d 16, 32 (1st Cir. 2003). [*12] Accordingly, the court will consider both theories of summary judgment addressed by the parties to the extent necessary to resolve the summary judgment motion.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n8 The court notes that the defendants' brief actually contains only nominal discussion of the qualified immunity argument and therefore provides virtually no assistance in resolving that issue. Counsel has an obligation to present sufficiently detailed legal and factual bases for any argument that is urged upon the court.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -



I. Alleged Denial of Adequate Medical Care

HN5 The Supreme Court has held that the rights of a pretrial detainee to adequate medical care under the due process clause are at least as great as the Eighth Amendment protections available to a convicted prisoner. City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 77 L. Ed. 2d 605, 103 S. Ct. 2979 (1983). Accordingly, "jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees that is tantamount [*13] to an intent to punish." Elliott v. Cheshire County, 940 F.2d 7, 10 (1st Cir. 1991) (internal quotation marks omitted); see also Mahan v. Plymouth County House of Corrs., 64 F.3d 14, 17 (1st Cir. 1995).

Ulmann argues that the defendants showed a deliberate indifference to his medical needs primarily by doing "absolutely nothing" as he suffered a heart attack in February, 2002, despite his complaints of chest pain. n9 He does not allege any instance, however, when the defendants failed to respond to either his requests for medical attention or other indications that he was having heart trouble. To the contrary, around the time at which Ulmann claims to have had a heart attack, he had repeatedly received treatment for chest pains from staff at both the MCHC and Concord Hospital, including tests which showed no signs of abnormal cardiac activity.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Ulmann's support for his claim that he actually suffered a heart attack while at the MCHC consists of statements allegedly made to him by two physicians who treated him in 2003, as represented in his brief, and a medical record generated around that time stating that Ulmann reported having been told that he "quite possibly" had a heart attack in February 2002. Such unauthenticated, multiple-hearsay statements do not constitute acceptable evidence for summary judgment purposes. See Fed. R. Civ. P. 56(c). Nevertheless, the court will assume in deciding this motion that Ulmann suffered a heart attack in February 2002, as he says.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*14]

HN6⊼"In order to be found 'deliberately indifferent,' prison officials must be shown to have been subjectively aware of a condition requiring their intervention." Mahan, 64 F.3d at 18 (citing Farmer v. Brennan, 511 U.S. 825, 847, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)). The record contains no evidence that the defendants knew Ulmann had suffered a heart attack in or around February 2002, or that they even could have known that he did, given that repeated medical examinations during that period failed to demonstrate such a condition. Accordingly, Ulmann has not provided any support for his theory that the defendants manifested a deliberate indifference to his medical needs by failing to prevent or respond to his alleged heart attack. See Mahan, 64 F.3d at 18 (affirming summary judgment for prison on inadequate medical care claim arising out of anxiety attacks in absence of evidence that prison "personnel were informed, or otherwise learned, of the serious symptoms [plaintiff] actually experienced while detained, such as would have made them subjectively aware of a condition requiring their intervention"); Bean v. Cunningham, 650 F. Supp. 709, 714 (D.N.H. 1986) [*15] (denying prisoner's claim of inadequate medical care because "when defendants received notice of plaintiff's complaint, they acted appropriately and expeditiously by having plaintiff examined by competent medical personnel").

In his amended complaint, Ulmann also alleges that the defendants "refused to give [him] any type of dietary consideration" for both his kidney condition and his diabetes. Although his objection fails to expand upon these allegations, the court has nevertheless reviewed the medical records submitted with Anderson's affidavit and concludes that the MCHC's handling of his diabetes and prostate and kidney problems was appropriate. n10 The defendants are therefore entitled to summary judgment on Ulmann's claim for allegedly inadequate medical care.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 The records show that after Ulmann complained of difficulty urinating on May 3, 2002, and November 20, 2002, he was promptly seen for these complaints by MCHC medical staff and urine specimens were taken. He also submitted a grievance on August 12, 2002, "speculating" that he might have prostate problems and other infirmities but was seen by Simons that same night. According to Anderson's unrebutted affidavit, Ulmann was placed on a diabetic diet on January 1, 2002, less than two weeks after his incarceration at the MCHC began. His blood sugar was tested three times each week.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*16]

II. Alleged Denial of Telephone Contact With Family

HN7⊼A pretrial detainee's use of the telephone may be subjected to limitations which "reasonably reflect[] legitimate apprehensions about the security and order" of the institution where he or she is detained. Feeley v. Sampson, 570 F.2d 364, 373 (1st Cir. 1978); accord Martin v. Tyson, 845 F.2d 1451, 1458 (7th Cir. 1988); Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986). Although Ulmann suggests in his objection that he "did not have an opportunity" at the MCHC to

make collect calls to his family, he has not submitted any evidence to controvert the statement in Anderson's affidavit that she has always allowed inmates to make collect calls from the day rooms while outside of their cells. Instead, he complains that the defendants would not allow him to make calling-card calls.

HN8 Courts have repeatedly held that the "use of a collect-only phone system by a prison or county jail is reasonable if it does not unduly limit access to counsel or the courts." Demits v. Tuso, 1996 WL 33972, at *2 (N.D. Cal. Jan. 17, 1996); see also Clark v. Plummer, 1995 U.S. Dist. LEXIS 7048, 1995 WL 317015, [*17] at *1 (N.D. Cal. May 18, 1995); Allen v. Josephine County, 1993 U.S. Dist. LEXIS 276, 1993 WL 11948, at *6 (D. Or. Jan. 13, 1993); Lane v. Hutcheson, 794 F. Supp. 877, 881 (E.D. Mo. 1992). The defendants therefore did not violate Ulmann's rights by limiting him to collect calls. Indeed, the uncontradicted evidence demonstrates that they extended him the privilege of charging calls to his calling card until they discovered that he had cost them $ 273 in long-distance charges by dialing directly instead, and even then offered to reinstate the privilege once Ulmann reimbursed them. The defendants are entitled to summary judgment on Ulmann's claim that they denied him access to his family over the telephone.

III. Alleged Denial of Consular Visitation

Ulmann alleges that the defendants "denied him proper consular visitation from the Israeli consulate" in that he was "allowed [only] one visit in . . . nine months and even that was not conducted in the manner that is allowed by law." The magistrate recommended that this claim be allowed on the basis of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 595 U.N.T.S. 261 (the "VCCR"). In [*18] relevant part, the VCCR provides that HN9 "consular officers shall have the right to visit a national of the sending State who is in prison, custody, or detention, to converse and correspond with him and to arrange for his legal representation." Id. art. 36(1)(c).

The defendants argue at the outset that because "violations of the VCCR have no effect on due process rights, . . . there is no support for further extending it to civil damages sought in a suit brought under section 1983 . . . ." In United States v. Li, 206 F.3d 56 (1st Cir. 2000) (en banc), the First Circuit considered whether the failure of American authorities to comply with Article 36 of the VCCR following the detention of Chinese nationals warranted the dismissal of indictments or the suppression of evidence against them. Id. at 59-60. Although the panel had convened to decide whether the VCCR "create[s] individual rights as to consular notification and access, that are enforceable by such individuals in court proceedings," the court declined to answer that question, deciding instead that neither the dismissal of an indictment nor the suppression of evidence would be the appropriate [*19] remedy for the violation of any such individually enforceable rights. Id. at 60.

Li, therefore, did not expressly foreclose the possibility that a foreign national can invoke the VCCR as a basis for judicial relief in this circuit. Nevertheless, its reasoning strongly suggests that the treaty cannot serve such a purpose. In fact, Judges Selya and Boudin concurred in a separate opinion in Li to point out that "essentially by drawing logical conclusions from many of the same considerations that are noted in the court's opinion," it follows that the VCCR does not confer any individual rights upon foreign nationals. Id. at 66. Other circuits have joined in this view. See United States v. Jimenez-Nava, 243 F.3d 192, 198 (5th Cir. 2001); United States v. Emuegbunam, 268 F.3d 377, 394 (6th Cir. 2001), cert. denied, 535 U.S. 977, 152 L. Ed. 2d 392, 122 S. Ct. 1450 (2002).

On the other hand, only one court has concluded that the VCCR furnishes a basis for judicial relief in a civil action. See Standt v. City of New York, 153 F. Supp. 2d 417, 427 (S.D.N.Y. 2001). The reasoning employed by the district court in Standt, [*20] however, conflicts with the First Circuit's analysis of the VCCR as set forth in Li. At the outset, Standt gave little weight to the presumption that international treaties do not create judicially enforceable rights in private parties, which factored heavily into the First Circuit's analysis. Compare 153 F. Supp. 2d at 422 with 206 F.3d at 61 & 66-67 (concurring opinion). The court in Standt also disagreed with the observation of the Li

majority that the VCCR is "facially ambiguous on the subject of whether [it] create[s] individual rights," 206 F.3d at 62, relying instead on Judge Torruella's partially dissenting opinion in Li for the proposition that "it is difficult to imagine 'how it is possible to frame language that more unequivocally establishes that the protections of Article 36(1)(b) belong to the individual national . . . .'" 153 F. Supp. 2d at 425 (quoting 206 F.3d at 72). Finally, Standt concluded that even if the VCCR were ambiguous on the issue of individually actionable rights, "outside interpretive sources" suggested that the treaty was intended to confer such rights. [*21] Id. at 425-27. The First Circuit, in contrast, relied on similar "nontextual sources" to reach the opposite conclusion. See Li, 206 F.3d at 63-66.

This court's interpretation of the VCCR as a source of private rights is necessarily constrained by the meaning ascribed to it by the First Circuit in Li. Although Li purported to leave that issue undecided, in this court's view the panel's reasoning leaves no room for a determination that *HN10* a foreign national may seek monetary relief in a civil proceeding for a violation of his rights under the VCCR. See Bieregu v. Ashcroft, 259 F. Supp. 2d 342, 353-54 (D.N.J. 2003) (holding that VCCR does not create duty enforceable in tort); cf. Sorensen v. City of New York, 2000 U.S. Dist. LEXIS 15090, 2000 WL 1528282, at *6 (S.D.N.Y. Oct. 16, 2000) (assuming without deciding that VCCR confers private rights, but holding that treaty does not provide for money damages). Because Article 36 of the VCCR does not bestow any rights upon Ulmann as an individual, it follows that the defendants did not violate any of his rights by allegedly denying him consular visitation. The defendants are entitled to summary judgment on that [*22] claim.

IV. Alleged Denial of Free Exercise of Religion

In 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act (the "RLUPIA"), which provides in relevant part that

> *HN11* No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> > (1) is in furtherance of a compelling governmental interest; and
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). *HN12* The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Id. § 2000cc-5(7)(A). Furthermore, if the plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause, the government shall "bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the . . . practice that [*23] is challenged by the claim substantially burdens the plaintiff's exercise of religion." n11 Id. § 2000cc-2(b).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 The defendants have filed a motion to dismiss Ulmann's RLUIPA claim on the ground that the statute is unconstitutional. The government has intervened to defend the constitutionality of the RLUIPA, filing an objection to the motion to dismiss in which Ulmann has joined. For reasons which will appear, the court need not reach the issue of the constitutionality of the RLUIPA.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Ulmann asserts that the defendants violated the RLUIPA by preventing him from lighting a menorah during Chanukah, using a teffilin, and adhering to a kosher diet while in custody. HN13↑To survive summary judgment on this claim, Ulmann must adduce evidence that these derelictions "substantially burdened the exercise of religion." Id.; see also Dunlap v. Losey, 40 Fed. Appx. 41, *42-43, 2002 WL 1001027, at *2 (6th Cir. May 15, 2002) (unpublished disposition). In giving meaning to the "substantial burden" test set forth by [*24] the RLUIPA, this court and others have looked to decisions interpreting the identical standard formerly imposed by the Religious Freedom Restoration Act (the "RFRA"). n12 Farrow v. Stanley, 2004 U.S. Dist. LEXIS 1518, *28, 2004 DNH 29, 2004 WL 224602, at *9 (D.N.H. Feb. 5, 2004); accord Borzych v. Frank, 2004 WL 67642, at *4-*5 (W.D. Wisc. Jan. 5, 2004); Marria v. Broadus, 2003 U.S. Dist. LEXIS 13329, 2003 WL 21782633, at *12 (S.D.N.Y. July 31, 2003).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n12 The Supreme Court has declared the RFRA unconstitutional, at least insofar as it regulates non-federal activity. City of Boerne v. Flores, 521 U.S. 507, 531-33, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

HN14↑This court has therefore defined "substantial burden on . . . religious exercise" under the RLUIPA as

> one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs. [*25]

Farrow, 2004 U.S. Dist. LEXIS 1518, *28, 2004 WL 67642, at *9 (quoting Charles v. Verhagen, 220 F. Supp. 2d 937, 944-45 (W.D. Wisc. 2002) (quoting Mack v. O'Leary, 80 F.3d 1175, 1179 (7th Cir. 1996) (interpreting RFRA), vacated, 522 U.S. 801, 139 L. Ed. 2d 5, 118 S. Ct. 36 (1997)), aff'd, 348 F.3d 601 (7th Cir. 2003)).

Anderson's affidavit and its appended documentation show that Ulmann did not request either a kosher diet or use of a tefillin until December 6, 2002, just twelve days before his discharge from the MCHC. n13 Ulmann attempts to dispute this fact by representing in his objection that he did ask for these accommodations in writing at some unspecified earlier time but that the defendants have since lost the documents. n14 These bald accusations are insufficient to defeat a properly supported motion for summary judgment. See, e.g., LeBlanc v. Salem (In re Mailman Steam Cleaning Corp.), 196 F.3d 1, 2 (1st Cir. 1999) (cautioning that, HN15↑in evaluating summary judgment motion, court does "not give credence to empty rhetoric, . . . but credit[s] only those assertions that are supported by materials of evidentiary quality"). Similarly, [*26] the exhortation to Ulmann from the Brooklyn rabbi in one of his letters "not [to] give up on kosher food" and the rabbi's third-hand understanding that the MCHC did not allow use of a tefillin do not constitute proof that Ulmann actually requested either of these accommodations from the defendants prior to his letter of December 6, 2002. n15

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n13 Although Ulmann noted in his letter of March 12, 2002, that he objected to eating pork on religious grounds, the letter did not refer to kosher meals as such and Ulmann does not argue that the defendants continued to serve him pork after that date.

n14 Ulmann also contends that both the Manchester and Brooklyn rabbis interacted with the MCHC on his behalf to secure kosher meals. In the absence of any affidavit from either of the rabbis or other evidence supporting this contention, however, it fails to create a factual issue.

n15 The other portions of the rabbi's letters on which Ulmann relies in his objection are irrelevant. They either refer to the rabbi's efforts to locate a tefillin among the belongings which Ulmann had apparently left with him or make no specific reference to the item whatsoever.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*27]

It is undisputed, then, that Ulmann spent nearly a year at the MCHC without alerting the staff that his religion demanded kosher meals and a tefillin for prayer. Under these circumstances, the defendants' failure to respond to Ulmann's needs during the final twelve days of his detention at their facility did not impose a "substantial burden" on his religious exercise within the meaning of the RLUIPA. See Dunlap, 40 Fed. Appx. 41, *42-43, 2002 WL 1001027, at *2 (holding that confiscation of prisoner's hardcover Bibles for one month, "while making the practice of his religion somewhat more difficult, did not coerce him into action contrary to his beliefs, and did not state a claim under the RLUIPA," where he failed to follow up on his initial request for softcover Bible until "a few days before his transfer"); Malik v. Kindt, 107 F.3d 21, 1997 WL 39429, at *4 (10th Cir. Feb. 3, 1997) (table) (preventing inmate from attending service for six weeks did not substantially burden religious practice under RFRA).

The defendants do not dispute that their refusal to allow Ulmann to possess a menorah due to the MCHC's prohibition on candles and glass substantially burdened his religious [*28] exercise. Accordingly, the court will assume without deciding that depriving Ulmann of a menorah amounts to a "substantial burden" within the meaning of the RLUIPA. The defendants do argue, however, that banning candles and glass advances a compelling governmental interest in safety and security at the MCHC and poses the least restrictive means of doing so.

HN16 As the Supreme Court recognized in Bell, "maintaining institutional security" represents one of the "essential goals that may require limitation or retraction of the retained constitutional rights of . . . pretrial detainees." 441 U.S. at 546 (footnote omitted). Lower courts have specifically determined that keeping inmates from lighting candles, despite their use in various religious rites, is a permissible means of reducing the threat of fire. See Brower v. Nuckles, 182 F.3d 916, 1999 WL 435173, at *2 (6th Cir. June 18, 1999) (table); Ward v. Walsh, 1 F.3d 873, 879 (9th Cir. 1993); Emel v. Mensinger, 1996 U.S. Dist. LEXIS 13498, *8, 1996 WL 468673, at *3 (E.D. Pa. Aug. 15, 1996). Bans on allowing prisoners to possess glass because of its potential use as an instrument of violence or suicide [*29] have also been upheld. See Munir v. Scott, 12 F.3d 213, 1993 WL 465162, at *2 (6th Cir. Nov. 10, 1993) (table); Lane, 794 F. Supp. at 883.

These cases largely had analyzed prison policies forbidding the items under the standard set forth in Turner v. Safley, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987). There, the Supreme Court held that "when a prison regulation impinges on an inmate's constitutional rights, [it] is valid if it is reasonably related to legitimate penological interests." Id. at 89; see also Savard v. Rhode Island, 338 F.3d 23, 30-31 (1st Cir. 2003) (en banc), cert. denied, 157 L. Ed. 2d 895, 124 S. Ct. 1074 (2004). Under the RLUIPA, however, any substantial burden imposed on an inmate's religious exercise cannot stand unless that burden represents the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a); see also Charles, 348 F.3d at 607-608. Thus, cases decided pursuant to the standard in place prior to the RLUIPA provide limited guidance in determining the validity of keeping religious [*30] articles from inmates under the new statutory regime. See Marria, 2003 U.S. Dist. LEXIS 13329, 2003 WL 21782633, at *18 n.37 (not following cases which upheld restriction on religious practice under Turner standard in applying RLUIPA analysis).

Nevertheless, based on the summary judgment record, the court concludes that there is no dispute that preventing detainees from lighting candles or possessing glass represents the least restrictive means of furthering the MCHC's compelling interest in maintaining institutional safety and security. n16 Although Ulmann suggested that he be permitted to light candles in the jail cafeteria under a guard's supervision, this alternative would not have diminished the stated concern that allowing open flames in the facility presents a safety hazard. Furthermore, MCHC staff arranged for a rabbi to visit the prison during Chanukah to oversee the lighting of an electric menorah for Ulmann, but the rabbi did not show up of his own accord. Ulmann's objection does not suggest any other way to preserve safety and security at the MCHC which would have effected a lesser restriction on his religious practices.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n16 Ulmann's promise in his objection "to bring in state prison personnel or others [as trial witnesses] to show that glass bulbs and candles are not a legitimate safety concern" does not create an issue of fact for summary judgment purposes.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*31]**

The defendants have therefore carried their burden under the RLUIPA to show that their policy, i.e., disallowing candles and glass but nevertheless arranging for a rabbi to oversee the lighting of an electric menorah at the jail, represented the least restrictive means of maintaining safety and security at the MCHC. Ulmann has failed to come forward with any evidence to the contrary. The defendants' decision to keep Ulmann from possessing a menorah with either candles or lightbulbs did not violate the RLUIPA. See Farrow, 2004 U.S. Dist. LEXIS 1518, *28, 2004 WL 224602, at *9-*10 (ruling that, although refusal to provide sweat lodge substantially burdened inmate's practice of Native American religion, RLUIPA not violated because of "need for intensive monitoring" of proposed use of lodge); cf. Charles, 220 F. Supp. 2d at 947-52 (ruling that forbidding inmate from having prayer oil violated RLUIPA where prison's stated security concerns were "not related to any specific difficulties presented by the possession of prayer oil," but on general problems caused by letting prisoners keep property of any kind); Marria v. Broaddus, 200 F. Supp. 2d 280, 298-99 (S.D.N.Y. 2002) **[*32]** (holding that banning members of particular faith from congregating or having religious literature violated RLUIPA). The defendants are therefore entitled to summary judgment on Ulmann's claim that they illegally interfered with the practice of his religion. n17

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n17 Because the defendants did not violate any of Ulmann's rights under the RLUIPA, they necessarily did not violate any of his rights under $^{HN17}$the free exercise clause, which provides less protection to his religious practices than the RLUIPA does. See Madison v. Riter, 355 F.3d 310, 315 n.1 (4th Cir. 2003); Mayweathers v. Newland, 314 F.3d 1062, 1070 (9th Cir. 2002), cert. denied sub nom. Alameida v. Mayweathers, 157 L. Ed. 2d 30, 124 S. Ct. 66 (2003).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

V. Alleged Denial of Adequate Food

Although the magistrate construed Ulmann's complaint to allege a possible claim that the defendants provided him with constitutionally inadequate food, Ulmann appears to retreat from any such claim in his objection, **[*33]** calling the defendants' contention that they provided him with

the vegetarian diet he requested "a smokescreen for some defense theory . . . meant to cloud the kosher diet issue." He has therefore failed to support any claim he might have made that the defendants violated his constitutional right to adequate nutrition while incarcerated at the MCHC. n18 Cf. Reed v. McBride, 178 F.3d 849, 853 (7th Cir. 1999) (ruling that plaintiff could proceed on constitutional claim based on allegation that defendants withheld food from him "on many occasions for three to five days at a time"). The defendants are entitled to summary judgment on Ulmann's claim, to the extent he makes one, that they denied him an adequate diet.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n18 Although Ulmann denies that the defendants provided him the vegetarian diet he requested, he points to nothing in the summary judgment record to support this assertion and offers no authority or argument for the proposition that refusing him a vegetarian diet would have violated his constitutional rights.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*34]**

Conclusion

For the foregoing reasons, the defendants are entitled to summary judgment on all of Ulmann's claims. Accordingly, the court need not reach the defendants' claim of qualified immunity. The defendants' motion for summary judgment (document no. 44) is allowed. The defendants' motion to submit their summary judgment exhibits by entry of a computer disk (document no. 46) has been allowed. The defendants' motion to dismiss (document no. 31), motion for entry of late authority in support (document no. 45), and motion to extend their deadline for filing pretrial materials (document no. 58) are denied as moot. Ulmann's motion to compel (document no. 51) and motion to extend the deadlines for discovery and for filing pretrial materials (document no. 54) are also denied as moot. n19 The clerk of court shall enter judgment accordingly and close the case.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 To the extent Ulmann's motion for a continuance seeks to compel the staff of the facility where he is currently incarcerated to allow him access to the law library, the motion is denied because the persons in charge of that facility are not before the court in this action.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*35]**

SO ORDERED.

Joseph A. DiClerico, Jr.

United States District Judge

April 26, 2004

Source:  Legal > / . . . / > **NH Federal District Courts** ⓘ
Terms:  **name(anderson)**  (Edit Search)
View:  Full
Date/Time:  Tuesday, October 26, 2004 - 4:01 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
⚠ - Caution: Possible negative treatment

- Positive treatment is indicated
A - Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.